### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

CAROLYN CLARK,           )
                            )
                 Plaintiff,   )    **CIVIL ACTION**
                            )
v.                         )    No. 07-1096-MLB
                            )
CUSTOM CAMPERS, INC.,    )
                            )
                 Defendant.   )
_____)

### MEMORANDUM AND ORDER

This matter comes before the court on defendant Custom Campers, Inc.'s ("Custom Campers'") motion for summary judgment. (Docs. 27, 28.) The motion has been fully briefed and is ripe for decision. (Docs. 33, 34.) The motion is GRANTED for the reasons stated more fully herein.

This is an employment discrimination case. Plaintiff, Carolyn Clark, makes claims against her former employer, Custom Campers, a manufacturer of fifth-wheel trailers, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. Plaintiff's employment with defendant was terminated as part of a reduction in force ("RIF"), and plaintiff alleges she was selected for layoff due to an alleged disability and/or her age.

## I.  FACTS

Plaintiff was born on July 10, 1962, and was thirty years old when she was hired by Custom Campers on August 3, 1992. Upon her hiring, plaintiff was placed in Custom Campers' cabinetry department, where she generally performed her job adequately. In January and

February 2002, however, plaintiff was counseled for her job performance because of her slow pace, and she was given a written warning.  Plaintiff was employed by Custom Campers until August 24, 2006, when she was forty-four years old.

On February 26, 2001, plaintiff was transferred from the cabinetry department to the trim department.  On April 9, 2001 plaintiff was diagnosed with tennis elbow and her elbow condition was additionally diagnosed as tendonitis, ulnar neuropathy, and lateral epicondylitis.[1]  Plaintiff was given a temporary restriction to avoid pushing, pulling, or lifting over five pounds.  On June 14, 2001, after a series of treatments, plaintiff's doctor released her from care, finding that she had reached maximum medical improvement.  Plaintiff's doctor also established permanent restrictions for plaintiff, stating "I think she should stay off the screw gun as this seems to aggravate her elbow symptoms."  Later, plaintiff was advised to avoid use of screw guns or power tools greater than five pounds with her right arm.

On January 29, 2002, plaintiff requested that she be moved from the trim department back to the cabinetry department.  Plaintiff was transferred back to the cabinetry department on March 25, 2002.  Plaintiff was allowed to perform a narrow set of jobs in the cabinetry department which did not require her to use a screw gun.  Such jobs did require her to use some other lightweight hand tools, but the

---

[1]  In 1999, plaintiff was diagnosed with carpal tunnel syndrome in both of her hands.  She had her left hand carpal tunnel released in December 1999, and her right hand carpal tunnel released in March 2000.  Plaintiff, however, has no permanent job restrictions relating to her previous carpal tunnel injuries.

-2-

tools did not weigh over five pounds, and were deemed to be within plaintiff's permanent restrictions. With her permanent restrictions, plaintiff can perform non-production jobs (*i.e.*, maintenance, administrative, and management positions) and some of Custom Campers' production jobs. During mid-2006, plaintiff reminded one of Custom Campers' production foremen, Craig Shults, of her permanent restriction against use of a screw gun.

During the spring and summer of 2006, Custom Campers realized a need to reduce its manufacturing output. Specifically, Custom Campers' yard inventory, which should be less than thirty, had increased to thirty-seven in May 2006 and forty-five in June 2006. Based upon this inventory buildup, Custom Campers made the decision to reduce its production by thirty percent. Accordingly, Custom Campers decided to cut its production staff by twenty-five percent.

Van Gotten, a member of Custom Campers' management, testified at his deposition that he suggested to Chuck Shults and Rick Barnow, two of Custom Campers' production foremen, that they use productivity and attendance as selection priorities for layoff. Shults testified in his deposition that Van Gotten gave him no criteria for selection of personnel, but then also stated that he used "performance" criteria, such as determining jobs that could be absorbed, people with attendance problems, and persons not working to their ability. Barnow testified that layoff selection was simply based on the number of people that needed to be reduced, and also that the selection criteria was based on safety, attendance, and job performance.

In August 2006, Shults initially took a list of Custom Campers' production employees and highlighted the names of the individuals whom

-3-

he felt should be laid off.  Shults then narrowed his highlighted list to a handwritten list of twenty-two employees.  Shults' handwritten list was provided to Pam Sheble in Custom Campers' human resources office and a typewritten list of employees to be laid off was created. Sheble was not involved in selecting individuals to be laid off. Shults' list was reviewed and discussed by other members of management and human resources, but remained substantially the same, except that some individuals on the list voluntarily quit their positions prior to the layoffs.

Shults testified that he used two bases for layoffs: performance (including attendance), and the ability of the employee's job duties to be absorbed by the remaining employees.  Shults added that plaintiff's position was selected for elimination because her job description was easily absorbed because the work plaintiff performed was not sufficient to occupy the time of a full-time employee.  Shults explained that plaintiff's medical condition and age were not considered when he selected plaintiff for layoff and that he simply looked at plaintiff's job duties to ascertain whether they would be easily absorbed by other employees.  Shults also testified that he did not consider whether plaintiff could absorb others' job duties.

Van Gotten testified that he understood that plaintiff was selected by Shults for layoff because her job was easily absorbed and he believed that the decision was consistent with his selection criteria.  In the year prior to her layoff, plaintiff was never informed by Custom Campers that she had a performance, productivity, or attendance problem.

Ultimately, Custom Campers laid off eighteen people on August 24,

-4-

2006.  None of the laid off positions has been filled or replaced, although one former employee (age 26) was rehired in October 2006 to fill a position that had been vacated _after_ the layoffs.  While Custom Campers has hired employees from time to time since the layoff to replace other employees who have quit or been terminated since August 24, 2006, its overall employment number has decreased since the layoff due to attrition.  Prior to the layoff on August 16, 2006, Custom Campers had approximately one hundred fifty-six production employees.  As of October 30, 2007, Custom Campers had ninety-five production employees.

Laid off employees were told that Custom Campers would carry their insurance for one month, with the hope that business would improve and Custom Campers would be able to bring the laid off employees back at that time.  However, the layoffs were made permanent on September 30, 2006.  "Change of Status" forms were prepared by Shults for each laid off employee in August 2006.  Fifteen of the eighteen employees were listed as "not available for rehire," two were listed as "maybe available for rehire," and one was listed as "available for rehire."  The forms also contained a section for evaluation of attendance, cooperation, attitude, quality of work, initiative, and productivity.  The ratings for each category were: excellent, good, fair, and poor.  Plaintiff received "good" markings for attendance and quality of work, and "fair" markings for attitude, initiative, and productivity.  Plaintiff received both a "good" and a "fair" mark for cooperation.

Plaintiff was forty-four years old at the time of the layoff.  Of the eighteen people that were laid off, three were older than

plaintiff.  The remaining fourteen laid off employees were younger than plaintiff.  Ten of the laid off employees were under thirty years old and six laid off employees were under twenty years old.  Of the twenty-one employees in the cabinetry department prior to the layoff, all eleven who were older than plaintiff were retained by Custom Campers.  The three employees who absorbed plaintiff's job functions were nineteen years old, sixty-one years old, and fifty years old at the time of plaintiff's lay off.  In the several weeks <u>preceding</u> the announcement of the layoffs, three younger males were hired into the cabinet department.

At the time of her layoff, plaintiff remained under the permanent restrictions issued by her orthopaedic surgeon, although she was able to perform her assigned job duties.  No one at Custom Campers told plaintiff that she was being laid off because of her medical restrictions, but plaintiff believes that Custom Campers laid her off because of her medical restrictions.  Plaintiff recalls being teased by her plant manager about her restriction against use of a screw gun "on a variety of occasions throughout the years 2001 through August 2006" and states that, as a result, she avoided asking for accommodation for her physical restriction.[2]  At the time of plaintiff's layoff, or thereafter, plaintiff was not offered a

_____

[2]  Defendant contends that plaintiff's affidavit establishing this fact qualifies as a sham affidavit.  (Doc. 34 at 4); <u>see</u> <u>Franks</u> <u>v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that "in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements" but that "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  This statement, however, does not contradict any prior sworn testimony.  Clark's prior sworn testimony was only that she was never told she was being laid off because of her medical condition.

transfer opportunity, reduction in pay or hours, or any other means
by which she could remain under Custom Campers' employ.

According to plaintiff's orthopedic physician, as of June 14,
2001, plaintiff had full range of motion with her elbow, but she
experienced "occasional discomfort in her elbow but it is not severe."
Plaintiff has no difficulty performing her current job as a cook for
a school district.  Plaintiff claims, however, that tendonitis causes
her pain and sleeplessness and restricts her arm movement; that she
is unable to mow, although her husband has primarily done the mowing
during their marriage; that she has difficulty lifting items, such as
grocery bags and laundry baskets; that she is unable to brush her
teeth comfortably and adequately and that she cannot "handle"
household cleaning chores such as garbage removal, vacuuming, and
floor scrubbing.[3]

Plaintiff filed suit on April 3, 2007.  In her complaint, she

_____

    [3]  Defendant alleges plaintiff establishes these facts through
a "sham affidavit."  (Doc. 34 at 2-3); see Franks, 796 F.2d at 1237.
Defendant contends that plaintiff's affidavit is directly contrary to
her deposition, in which she stated she had no difficulty with any
tasks other than mowing, lifting grocery bags, and lifting laundry
baskets. (Plaintiff's affidavit states she had "difficulty recalling"
the additional impaired tasks during her deposition.)
    Defendant states that plaintiff was cross-examined by her counsel
during her deposition and had all the relevant information available
to her and was not confused at her deposition.  See id. ("Factors
relevant to the existence of a sham fact issue include whether the
affiant was cross-examined during his earlier testimony, whether the
affiant had access to the pertinent evidence at the time of his
earlier testimony or whether the affidavit was based on newly
discovered evidence, and whether the earlier testimony reflects
confusion which the affidavit attempts to explain.").
    While the court does not approve of the practice of using
affidavits to supplement, in effect, deposition testimony, the court
concludes that, even with these facts, plaintiff's ADA claim cannot
succeed, and the court sets out the statements from plaintiff's
affidavit.

brought claims under the ADA and the ADEA.  See Doc. 1 (complaint); Doc. 25 at 5-6 (pretrial order).  The subject of exhaustion of plaintiff's administrative remedies is uncontested, and plaintiff states in her complaint that she has received a notice of right to sue letter by the Equal Employment Opportunity Commission ("EEOC").  (Doc. 1 at 1.)

## II.  SUMMARY JUDGMENT STANDARDS

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.  Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## III.  ANALYSIS

## A.  Plaintiff's ADA Claim

The ADA prohibits an employer from discriminating against a qualified individual with a disability in termination of employment. 42 U.S.C. § 12112(a).  The "analytical framework" first pronounced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to causes of action under the ADA.  MacKenzie v. City & County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005).  Because plaintiff presents no direct evidence of discrimination but instead relies on indirect evidence, she has the initial burden of establishing a prima facie case of disability discrimination.  See McDonnell Douglas, 411 U.S. at 802.  If plaintiff does so, then defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action.  Id.  Plaintiff then bears the ultimate burden of demonstrating that defendant's stated reason is a pretext for unlawful discrimination and, therefore, unworthy of belief.  See id. at 804.

In order to make a prima facie case of discrimination, plaintiff must show: 1) she is a disabled person as defined by the ADA; 2) she is able to perform the essential functions of her job, with or without accommodation; and 3) defendant discriminated against her because of her disability.  MacKenzie, 414 F.3d at 1274; Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1225 n.11 (10th Cir. 2006) (ADA case stemming from an RIF).  Defendant does not address the second or third prongs of plaintiff's prima facie case but challenges only plaintiff's showing under the first prong.

As a result, the court's analysis of plaintiff's prima facie case begins with the ADA's definition of "disability."  The term disability

-9-

is defined by section 12102(2) of the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[4]   An analysis under this definition of "disability" requires a three-step process.  MacKenzie, 414 F.3d at 1275.

First, the court must consider whether plaintiff suffers from a physical impairment.   Second, the court must identify the life activity upon which plaintiff relies and determine whether it constitutes a major life activity under the ADA.   Third, the court must determine if plaintiff's impairment substantially limits the major life activity.   Whether plaintiff has an impairment within the meaning of the ADA is a question of law.   Whether the alleged affected conduct is a major life activity is also a legal question.   "However, ascertaining whether the impairment substantially limits the major life activity is a factual question."   Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

Plaintiff contends that the tendonitis in her elbows and her carpal tunnel syndrome constitute a physical impairment under the ADA, see Doc. 25 at 3 (pretrial order), which amount to a disability in performing manual tasks.  (Doc. 33 at 9.)  Plaintiff asserts that her performance of manual tasks is substantially limited because she cannot: 1) do laundry; 2) transport grocery bags; 3) use a lawn mower; 4) comfortably or adequately brush her teeth; 5) bathe without extreme difficulty; 6) remove garbage, vacuum, or scrub floors; and 7) sleep

---

[4]   The ADA also defines disability as: 1) "a record of such an impairment"; or 2) "being regarded as having such an impairment." These alternative definitions of disability are not in issue.   See Doc. 33 at 10 n.2.

without difficulty due to pain.  (Doc. 33 at 9.)

Defendant does not dispute that plaintiff has a physical impairment.  Plaintiff has established that she suffers from a "physiological disorder, or condition . . . affecting one or more of the following body systems: . . . musculoskeletal" due to her tendonitis and carpal tunnel syndrome.  29 C.F.R. § 1630.2(h)(1).  The court finds that plaintiff has met her burden under this first step of the definition of disability.

The term "major life activity" is also defined by EEOC regulations.  It includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  Performing manual tasks, the life activity plaintiff claims is affected by her physical impairment, is listed as a major life activity under the EEOC regulations.  Id.  Thus, plaintiff has also met her burden under the second stage of the definition of disability.

Therefore, the question that remains in the definition of disability is whether plaintiff's tendonitis and carpal tunnel syndrome "substantially limits" the major life activity of performing manual tasks.[5]  The term "substantially limits" is also defined within EEOC regulations.  The regulations state:

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

---

[5]  While this is a factual question, the court may decide this issue on summary judgment if plaintiff has failed to create a factual issue.  Doebele, 342 F.3d at 1130.

> > (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

> > (i) The nature and severity of the impairment;

> > (ii) The duration or expected duration of the impairment; and

> > (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(1)-(2).

In order to establish that she is substantially limited in the major life activity of performing manual tasks, plaintiff must demonstrate that she is unable to perform manual tasks or is significantly restricted in her ability to perform manual tasks as compared to the average person in the general population. Sutton v. United Air Lines, Inc., 130 F.3d 893, 900-01 (10th Cir. 1997). The word "substantially" in the phrase "substantially limited" means "considerable" or "to a large degree." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196 (2002). "The word substantial thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." Id. at 197; see also McWilliams v. Jefferson County, 463 F.3d 1113, 1116-17 (10th Cir. 2006)(holding that the plaintiff had "not produced

-12-

evidence that she was substantially impaired or significantly restricted in any major life activity" because she did not show that she was "unable to perform any of the life activities completely").

When the impairment of the major life activity appears substantially limiting on its face, comparative evidence is not required as a matter of law to withstand a motion for summary judgment. <u>Lusk v. Ryder Integrated Logistics</u>, 238 F.3d 1237, 1240 (10th Cir. 2001). In <u>Lusk</u>, the Tenth Circuit stated, however, that: "Evidence that a lifting impairment merely affects a major life activity is generally insufficient; rather, a plaintiff must produce comparative evidence from which a reasonable inference can be drawn that such activity is substantially limited." Because the plaintiff in <u>Lusk</u> did not describe any substantial limitations on his day-to-day activities, the long term impact of his restriction, or present any comparative evidence as to the general population's lifting capabilities, the court held the plaintiff had not met his summary judgment burden.

Even taken in the light most favorable to plaintiff, however, the court cannot find that plaintiff has created a genuine factual issue for the jury regarding whether she meets the ADA's definition of disability. Plaintiff is not substantially limited in the performance of manual tasks simply because she has listed a few activities she cannot perform. For example, plaintiff states she cannot "handle" household cleaning chores, but statements such as these do not show that plaintiff has a limitation which is "substantially limiting on its face." <u>Lusk</u>, 238 F.3d at 1240. Rather, plaintiff has only created a factual issue that her major life activities is "merely

-13-

affect[ed]." Id. Plaintiff has offered no comparative evidence which permits a reasonable inference that the activity of performing manual tasks has been substantially limited.[6]

However, even assuming plaintiff had created a genuine factual issue on this element, her ADA claim would still fail. After an ADA plaintiff has established a prima facie case of disability discrimination, the burden shifts to defendant to articulate some "legitimate, nondiscriminatory reason" for the challenged personnel action. McDonnell Douglas, 411 U.S. at 802. Plaintiff then bears the ultimate burden of demonstrating that defendant's stated reason is a pretext for unlawful discrimination and, therefore, unworthy of belief. See id. at 804.

Defendant contends plaintiff was laid off as part of a reduction in force because her position was terminated and absorbed by other employees. This is a legitimate, nondiscriminatory reason for termination of employment. See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1227 (10th Cir. 2006); Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1193 (10th Cir. 2006). It is undisputed that a reduction in force was necessary at Custom Campers due to an increase in inventory and declining sales. These factors necessitated a reduction in production staff. See Jackson v. NTMedia, LLC, 233 Fed.

---

[6] In fact, plaintiff did very little to respond to defendants' motion. Defendant devoted several pages to plaintiff's claim of disability and cited relevant cases. (Doc. 28 at 8-13.) Plaintiff did not respond to defendants' argument or discuss defendants' cited case law. (Doc. 33 at 9-12.)

In addition, plaintiff's response has a footnote (Doc. 33 at 10) that is, at best, ambivalent regarding whether she is pursuing anything other than the "manual tasks" claim set out in the parties' pretrial order (Doc. 25 at 3).

-14-

Appx. 770, 778 (10th Cir. 2006) (finding that a reduction in force because of financial difficulties is a legitimate, non-discriminatory basis for termination of employment).

The burden then shifts to plaintiff to show that defendant's stated reason for termination of her employment was a pretext for unlawful discrimination. McDonnell Douglas, 411 U.S. at 804. Pretext is shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

In the RIF context, a plaintiff can show pretext in several ways, as outlined by the Tenth Circuit:

> In a RIF case, a plaintiff can demonstrate pretext in three principal ways. That is, [a plaintiff] can present evidence that (1) his own termination does not accord with the RIF criteria, (2) Defendant's RIF criteria were deliberately falsified or manipulated in order to terminate him, or (3) that the RIF generally was pretextual. This third approach is sometimes satisfied by a showing that the defendant actively sought to replace a number of RIF-terminated employees with new hires during the RIF general time frame.
>
> In a typical non-RIF context, we have also said a showing of pretext can look to prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria.

Pippin, 440 F.3d at 1193 (internal quotations and citations omitted).

-15-

Plaintiff attempts to show pretext by <u>alleging</u>: 1) Shults testified at his deposition that he selected plaintiff for non-retention based on her screw gun limitation; 2) the selection criteria for the RIF was stated differently by Van Gotten, Shults, and Barnow at their depositions and no <u>written</u> criteria were used; 3) three younger, allegedly non-disabled workers were hired by Custom Campers in the several weeks preceding the layoffs and one was given some of plaintiff's job duties after her layoff; and 4) plaintiff was not re-hired after the layoffs despite another employee allegedly being re-hired. (Doc. 33 at 11-13.)

However, plaintiff's attempt at showing pretext fails. Plaintiff's first basis for pretext is flatly contradicted by the evidence. Shults' pertinent deposition testimony is as follows:

> Q: Why did you select Carolyn Clark for the list of proposed layoff victims?
>
> [Objection]
>
> A: The job that she was doing was easily absorbed by a couple, three people.
>
> Q: Why was Ms. Clark not identified as someone who could have participated in absorbing other duties?
>
> A: I'm not clear on the question.
>
> Q: Well, was Ms. Clark capable, in your mind, of performing all the varied functions in the cabinet department in August of 2006?
>
> A: No, she was not.
>
> Q: Why is that?
>
> A: Because she had a restriction for a screw gun.
>
> Q: Okay.  So that restriction entered in then, I assume, based on your testimony to your judgment about whether she could have absorbed any other

-16-

positions or duties?

A: That's correct.

Q: Okay.  What proportion, if you can estimate, of the functions within the cabinet department in August of 2006 was Ms. Clark ineligible for due to the screw gun restriction she was under at that time?

A. I would say 90 percent.

(Doc. 33 Exh. C at 50-51.)  Shults thus testified only that plaintiff was unable to perform other positions because of her screw gun limitations (a fact plaintiff does not controvert), not that he selected her for layoff because of her limitation.  Shults clarified on cross-examination:

Q: Now, you indicated that Ms. Clark had a restriction in the use of a screw gun and that would have restricted her on some of the jobs she can perform at Custom [Campers], correct?

A: Correct.

Q: Now, was that, I guess as you're deciding to select her for layoff, was that what you were thinking of, or were you simply looking at her duties [that] could be more easily absorbed by someone else?

[Objection]

A: I was looking at her job duties [that] could be easily absorbed by someone else.

(Doc. 33 Exh. C at 65.)

From the totality of Shults' deposition testimony, no other conclusion can be reached except that plaintiff was chosen for layoff by Shults because her job functions were easily absorbed by others. Shults did testify that plaintiff could not have herself absorbed many job functions, but Shults did not testify that he "selected Ms. Clark for non-retention based upon her screw gun restriction" as alleged.

-17-

See also Gilkey v. Siemens Energy & Automation, Inc., 125 Fed. Appx. 908, 911 (10th Cir. 2005) (finding that proffered "legitimate non-discriminatory" reason for plaintiff's termination in RIF--that the plaintiff's job positions were most easily combined with other positions and that plaintiff was not qualified to assume to the combined position--had not been rebutted as pretext because the plaintiff pointed to "nothing in the record to suggest he was qualified" for the other positions).

The second alleged basis for pretext--that Van Gotten, Shults, and Barnow stated the selection criteria for the layoffs differently and that there was no written plan--is exaggerated in the first respect and immaterial in the second respect. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1168 (10th Cir. 1998) (explaining that pretext may be supported by an employer's failure to follow its own criteria for an RIF).

Regarding the selection criteria, all three testified that performance and attendance were factors used in choosing individuals for lay off. Shults was the only individual to particularly testify concerning the plaintiff's selection being based on her job duties being easily absorbed, but neither Van Gotten nor Barnow contradicted Shults' assertion, and this is clearly a "performance" issue. In addition, minor inconsistencies in an employer's application of RIF criteria are "too insubstantial to allow a reasonable jury to infer that the RIF was pretextual" for age discrimination. Beaird, 145 F.3d at 1168. See also Platero v. Williams Field Serv.s Co., 173 Fed. Appx. 705, 708 (10th Cir. 2006) (stating that "when a subjective decision is *made by* someone *whose motives have been put in question*

-18-

*in the case*, an inference of pretext may be appropriate" but that pretext "is ordinarily inferred only when the criteria on which the employers ultimately rely are *entirely* subjective"); <u>Pippin</u>, 440 F.3d at 1195 ("The subjective nature of the evaluations may be a factor to consider in pretext but it ordinarily is not by itself sufficient to establish pretext."). Plaintiff has alleged no basis for a finding that the fact that Custom Campers' RIF plan was oral, rather than written, is material.

The third alleged basis for a finding of pretext—that three younger, allegedly non-disabled workers were hired by Custom Campers in the several weeks preceding the layoffs and that one of the relatively new hires was given some of plaintiff's job duties after her layoff—is again not evidence of pretext. Defendant does not controvert that three new employees were assigned to work at Custom Campers between July 24, 2006 and August 7, 2006[7] and that these employees were under the age of forty. Defendant correctly points out, however, that plaintiff has introduced no evidence regarding these new hires' work at Custom Campers. <u>See Pippin</u>, 440 F.3d at 1194 (finding that new employees being hired in the period surrounding a RIF was not evidence of pretext partly because the plaintiff "provided no details about [the new hires'] qualifications or what job functions they assumed, which makes a comparison to [the plaintiff's] abilities and treatment nearly impossible").

The only alleged evidence is that <u>plaintiff</u> did not perceive the three new hires to have a disability, that the new hires were under

---

[7]  Plaintiff's employment was terminated August 24, 2006.

-19-

age thirty, and that plaintiff believes the new employees were "hired into my [plaintiff's] Cabinet department at Custom."   There is no evidence whether these new hires filled open positions, whether all three new hires remained at Custom Campers after the RIF, or whether the new hires performed similar job duties to plaintiff.   There is simply no basis in the record that could support a finding that Custom Campers' hiring of three people in the month <u>prior to</u> the RIF is evidence that the RIF was a pretext for unlawful discrimination.   <u>See cf.</u> <u>Beaird</u>, 145 F.3d at 1165-65, 1175 (finding pretext when four new employees were hired to "do the same job" despite the employer claiming that plaintiff's firing was "operationally necessary").   In addition, the fact that a portion of plaintiff's job duties "were assumed by another [younger] employee does not establish pretext." <u>Pippin</u>, 440 F.3d at 1194.

Finally, the fourth alleged basis for pretext--that plaintiff was not re-hired at Custom Campers despite another employee allegedly being re-hired--is not supported by the record.   Plaintiff claims that Mary McKinsey was "reinstated" in October 2006 after her employment was terminated in August 2006 as part of the RIF, citing Shults' recollection that McKinsey was "rehired."   This is contradicted by the evidence, however.   Defendant responds that Custom Campers did not rehire any of the laid off employees and that McKinsey was assigned to Custom Campers from an employment agency in October 2006 to fill a position that had been vacated <u>after</u> the August 2006 lay offs.   This final allegation is not pretext of unlawful discrimination in any way.

The court realizes, of course, that it must consider the totality of the alleged pretext evidence.   <u>Beaird</u>, 145 F.3d at 1174.   However,

-20-

neither when considered alone nor cumulatively, does plaintiff's alleged evidence of pretext suffice.  As a result, plaintiff has not carried her burden of creating a genuine issue of material fact that Custom Campers' RIF was a pretext for unlawful disability discrimination.  Plaintiff's ADA claim therefore fails, and defendant's motion for summary judgment is granted.

**B.  Plaintiff's ADEA Claim**

To prevail on a discriminatory discharge claim under the ADEA, a plaintiff bears the ultimate burden of proving age was the motivating factor for the employer's decision to terminate her. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000). A plaintiff can prove an age discrimination claim by presenting either direct or indirect evidence of discrimination.  Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000).  "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).  Plaintiff asserts no direct evidence of age discrimination, and the court must therefore determine whether she has provided indirect evidence of discrimination by utilizing the McDonnell Douglas framework.  Stone, 210 F.3d at 1137.

To prevail on a claim of age discrimination in the RIF context, a plaintiff must show: "(1) the claimant is within the protected age group; (2) he or she was doing satisfactory work; (3) the claimant was discharged despite the adequacy of his or her work; and (4) there is some evidence the employer intended to discriminate against the claimant in reaching its RIF decision." Stone, 210 F.3d at 1137; Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1225 n.11 (10th Cir.

-21-

2006) (reduction in force ADEA, Title VII, and ADA case); <u>Beaird v. Seagate Tech., Inc.</u>, 145 F.3d 1159, 1165 (10th Cir. 1998) (reduction in force ADEA and Title VII case). "This fourth element may be established 'through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF.'" <u>Pippin v. Burlington Res. Oil & Gas Co.</u>, 440 F.3d 1186, 1193 (10th Cir. 2006) (quoting <u>Beaird</u>, 145 F.3d at 1165).

Defendant disputes whether plaintiff can establish the fourth element of her prima facie case, arguing that plaintiff cannot show she was treated less favorably than younger employees during the RIF. Defendant contends that because 1) thirteen of the eighteen laid off employees were under the age of forty and 2) of the twenty-one employees in plaintiff's department, eleven were older than plaintiff and all eleven were retained, younger employees were therefore <u>more</u> likely to be terminated than older employees. In addition, of the three employees in positions that absorbed plaintiff's position's job duties, two of the three employees were older than plaintiff. (Doc. 28 at 16-17.)

Plaintiff responds that the evidence that three new hires were made of employees under the age of thirty in the weeks preceding the RIF is evidence that younger employees "were treated more favorably" than plaintiff "during the general time frame of the RIF." In addition, plaintiff alleges the evidence of McKinsey's rehire in October 2006 is evidence of "substantially more favorable treatment" of younger employees. (Doc. 33 at 14-15.)

Regarding the fourth element of a prima facie case in an ADEA case based on a RIF, the Tenth Circuit has stated:

-22-

> Of course, in a RIF case, the plaintiff cannot actually point to a continuing vacancy [to prove the fourth element of her prima facie case] because her position has been eliminated. She can, however, point to circumstances that show that the employer could have retained her, but chose instead to retain a younger employee. In such circumstances, 'lack of vacancy' cannot explain the contested employment decision because the employer prefers to retain a younger employee in a position for which the plaintiff is qualified. Even though certain exigencies of RIF cases may explain the employer's action in such circumstances, these exigencies are best analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the discharge.
>
> For instance, a plaintiff who is fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element. The company's decision to reduce its workforce does not in itself legitimate the employer's choice to fire the employee from the protected class rather than the younger employee. 'Lack of vacancy' is thereby eliminated as a nondiscriminatory explanation for that plaintiff's dismissal and, assuming the first three elements are met, a prima facie case has been shown.

Beaird, 145 F.3d at 1167-68 (internal footnotes and citations omitted). Plaintiff, because she has alleged that Custom Campers hired a younger employee that later absorbed a portion of plaintiff's job duties after her layoff, has carried her burden for the fourth element of her prima facie case.

Regardless, however, of whether plaintiff can establish a prima facie case of age discrimination, plaintiff's claim fails because she cannot show any evidence of pretext. As stated above, defendant has stated a legitimate, nondiscriminatory justification for plaintiff's lay off--i.e., a RIF precipitated by excess inventory necessitating the termination of plaintiff's position because her job duties were easily absorbed. Assuming plaintiff has established her prima facie

case, plaintiff can therefore only survive summary judgment by showing pretext.  <u>Beaird</u>, 145 F.3d at 1165.  The standards of law regarding pretext are laid out above.

Regarding pretext, plaintiff "incorporates its arguments regarding pretext" set forth in her ADA claim.  (Doc. 33 at 15.)  The court has already found plaintiff's arguments concerning pretext to be insufficient to carry her burden in that regard.  Plaintiff has not shown that Custom Campers' RIF was a pretext for unlawful discrimination.

Plaintiff has not carried her burden of showing that Custom Campers intended to discriminate against her in reaching its RIF decision or that the RIF was a pretext for unlawful age discrimination.  Plaintiff's ADEA claim therefore fails, and defendant's motion for summary judgment is granted.

## IV.  CONCLUSION

Defendant's motion for summary judgment (Doc. 27) is GRANTED for the reasons stated more fully herein.  The clerk is directed to enter judgment for defendant pursuant to Rule 58.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (1992).  The response to any motion for reconsideration shall not exceed 3 double-spaced pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this ___7th___ day of April, 2008, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE